UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**FRANKFORT**

Eastern District of Kentucky
**FILED**

SEP - 8 2005

AT FRANKFORT
LESLIE G WHITMER
CLERK U S DISTRICT COURT

TRITENT INTERNATIONAL CORP.;          )
DWI, LLC; and CIBAHIA TABACOS         )
ESPECIAS LTDA,                        )
                                      )  Civil Action No. 3:04-67-JMH
        Plaintiffs,                   )
                                      )
v.                                    )  **MEMORANDUM OPINION AND ORDER**
                                      )
                                      )
COMMONWEALTH OF KENTUCKY,             )
                                      )
        Defendant.                    )

**       **       **       **       **

This matter is before the Court on Defendant's motion to dismiss [Record No. 36]. Plaintiffs filed a response [Record No. 74] to which Defendant replied [Record No. 75]. This matter is now ripe for review.

### FACTUAL BACKGROUND

In 1998, 46 states including Kentucky, collectively known as the "Settling States," entered into the Master Settlement Agreement ("MSA") with the four major cigarette companies, Philip Morris, Lorillard, Brown & Williamson, and R.J. Reynolds, collectively known as "Original Participating Manufacturers" ("OPMs"). The MSA allowed for other manufacturers to join the agreement, and more than forty cigarette companies have joined as "Subsequent Participating Manufacturers" ("SPMs"). Together, the OPMs and SPMs are known as "Participating Manufacturers."

Participating Manufacturers are required to make large annual

payments to the Settling States in perpetuity to offset a portion of healthcare and other costs imposed on states by smoking-related diseases. For OPMs, the annual payment is determined by their relative market share compared to the other Participating Manufacturers. For SPMs, the annual payments are based on a flat rate per cigarette for each cigarette sold above a certain "grandfathered" amount, which is set at the higher of either the individual SPM's 1998 market share or 125% of the SPM's 1997 market share. In addition, Participating Manufacturers must adhere to certain other conditions, such as restrictions on advertising. In exchange for these commitments, the Settling States agreed to dismiss pending lawsuits and refrain from filing additional lawsuits against the Participating Manufacturers.

Although the four major cigarette companies are OPMs, and many other smaller cigarette companies have chosen to become SPMs, there are also many cigarette companies that have declined to join in the MSA. These companies are collectively known as "Nonparticipating Manufacturers" ("NPMs"). The Participating Manufacturers feared that they would lose market share to the NPMs, who would not be burdened by the large annual payments to be made by OPMs and SPMs, and therefore would be able to charge lower prices. Therefore, they included in the MSA the NPM Downward Adjustment, which decreases the OPMs' annual payments if they lose market share to NPMs. The MSA also included a provision that required the Settling

2

States to pass escrow statutes, as described below, or face substantial reductions in the annual payment. These provisions made it in the Settling States' best interest to prevent a loss of market share to NPMs as well.

In 2000, Kentucky passed an Escrow Statute, as provided for in the MSA, designed to address the concern that NPMs would escape liability for smoking-related costs associated with their cigarettes. *See* KRS 131.600-602 (2004). The statute forces NPMs to either become SPMs (which would require paying to the state all money that would have been owed if the NPM had been an SPM from the beginning), or else to place a specified amount of money into escrow. The amount required to satisfy the second option is intended to approximate the amount being paid to the state by Participating Manufacturers, and is based on a flat fee per cigarette that will increase over time. Currently the escrow amount is about 1.67 cents per cigarette, about $4 per carton. *See* KRS 131.602(1)(b). The NPMs are entitled to receive the interest from the escrow account, and the escrow accounts are set up as twenty-five year revolvers, with each year's escrow payment repaid to the NPM after being held for that period. *See* KRS 131.602(2).

In addition, the money can be removed from the escrow account in two other circumstances. First, the money can be taken out of escrow to pay any judgment or settlement to the state related to smoking-related costs. *See* KRS 131.602(2)(a). Second, under the

3

Allocable Share Release ("ASR") provision, KRS 131.602(2)(b), the NPM can request that any amount the NPM paid into escrow that was in excess of what it would have been forced to pay to Kentucky if it had been an SPM be returned to them.  The statute as originally enacted provided as follows:

> To the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow in a particular year was greater than the state's allocable share of the total payments that such manufacturer would have been required to make in that year under the Master Settlement Agreement . . . had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer.

This statute was intended to equalize the amounts paid into escrow by NPMs and the amounts paid to the states by SPMs.  If NPMs sold their products nationally, this indeed would be the case.  However, for regional NPMs that only sold in a few states, the ASR allowed the NPMs to recover almost all of the money placed into escrow.  For example, an NPM selling cigarettes only in Kentucky would pay the flat rate intended to be equivalent to that paid by an SPM selling the same number of cigarettes nationwide, but would be able to recover over 98% of that money since Kentucky's allocable share under the MSA is less than two percent.  To correct this imbalance, in 2004 Kentucky enacted what Plaintiffs call the ASR Repealer, HB 97, amending KRS 131.602(2)(b) to read as follows:

> To the extent that a tobacco product manufacturer establishes that the amount it

4

was required to place into escrow on account of units sold in the state in a particular year was greater than the master settlement agreement payments, as determined pursuant to section IX(I) of that agreement, including after final determination of all adjustments, that such manufacturer would have been required to make on account of such units sold had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer.

The ASR as amended returns funds from escrow back to the NPM based on the excess over not Kentucky's allocable share under the MSA, but rather the number of units actually sold in Kentucky.

To ensure that NPMs were forced to make the required escrow payments, Kentucky enacted a third statute, the Contraband Statute, which makes it illegal for distributors to place Kentucky tax stamps on cigarettes purchased from NPMs who are not in compliance with the Escrow Statute. *See* KRS 131.612. The Attorney General of Kentucky is required to maintain a list of compliant companies, and is empowered to de-list noncompliant companies. *See* KRS 131.610.

Plaintiffs in their Amended Complaint describe five mechanisms by which the MSA and its implementing statutes create and sustain the cartel:[1]

a. Keying the annual settlement payment of each Major to its relative Market Share for that year;

b. Restricting the output of firms joining the

---

[1] Citations to the various provisions of the MSA have been omitted

5

MSA after it was executed [i.e. SPMs] . . .;

c. The mandate in the MSA requiring enactment by the Settling States of escrow statutes which force NPMs to make escrow payments to eliminate any "cost advantages" those NPMs would have by not joining the MSA;

d. The "diligent" enforcement of these escrow statutes required of each Settling State by the MSA, e.g. enactment and enforcement of contraband statutes in 43 of the 46 Settling States preventing sales by NPMs not making escrow fund payments; and

e. Enactment of the ASR Repealers in now at least 39 of the Settling States.

As a direct result of these conditions, the OPMs have been able to raise prices dramatically without losing any substantial share of the market. The wholesale price of a carton of premium cigarettes has increased from $19 to over $30 since the MSA, while the OPMs' market share has dropped only from 98% to approximately 90%. The total number of cigarettes sold domestically by the OPMs dropped twenty-five percent from 1999 to 2003, yet the OPMs' profits have increased.

OPMs have an incentive to not compete on price, since a gain in market share would lead to higher annual settlement payments. SPMs have an incentive to not compete in price, since any market share they gained would lead to their exceeding their grandfathered number of sales, which are exempt from annual payments. NPMs face the equivalent of a tax on their sales in the form of the flat fee per cigarette that must be placed in escrow; this fee prevents them

6

from competing by lowering prices below what the Participating Manufacturers are able to charge.[2]

## PROCEDURAL BACKGROUND

Plaintiffs Trident International Corp. ("Trident"), DWI, LLC ("DWI"), and Cibahia Tabacos Especias Ltda. ("Cibahia") filed this action against the Commonwealth of Kentucky on September 23, 2004, alleging claims arising out of the MSA and ensuing legislation passed to implementing the agreement.   Plaintiffs are, respectively, a cigarette importer, a cigarette wholesaler, and a cigarette manufacturer.   None of the Plaintiffs are parties to the MSA, and none have become SPMs.   Cibahia and the company through which Trident buys cigarettes have been de-listed from the Attorney General's list of manufacturers eligible to have their cigarettes

---

[2]   Plaintiffs also allege many facts that are immaterial to the current motion.   Plaintiffs assert that the MSA and its implementing statutes have been ineffective in reducing smoking and that a flat tax on cigarettes would be more effective, but the effectiveness of a state policy is irrelevant to the question of whether the state statute will be preempted.  *See Hoover v. Ronwin*, 466 U.S. 558, 574 (1984) (noting that the Supreme Court has never "suggested . . . that a state action is exempt from antitrust liability only if the sovereign acted wisely").   Plaintiffs also devote substantial space to showing that the Settling States' motivations were purely directed toward raising revenue, and that in effect the Settling States entered into a conspiracy with the OPMs to violate the Sherman Act.   However, a state's subjective motivations in enacting legislation are irrelevant to whether that legislation can be challenged under the antitrust laws, *see Consol. Television Cable Serv., Inc. v. City of Frankfort*, 857 F.2d 354, 362 (6th Cir. 1988), and there is no conspiracy exception to state action immunity.   *See Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 535 (6th Cir. 2001).

sold in Kentucky.

Specifically, Plaintiffs allege that Kentucky's Escrow, Contraband, and ASR and ASR Repealer Statutes (collectively referred to as the "implementing statutes") are preempted by Section 1 of the Sherman Act, and that those statutes also violate Plaintiffs' right to due process, equal protection, and freedom of speech, as well as being prohibited by the Kentucky Constitution's prohibition of special legislation. Plaintiffs seek declaratory and injunctive relief.

Plaintiffs also seek to have a class comprising "all firms throughout the United States that purchase cigarettes made by manufacturers that do not make MSA settlement payments" certified pursuant to Federal Rules of Civil Procedure ("Rules") 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

On February 25, 2005, Defendant filed a motion to dismiss the complaint pursuant to Rule 12(b)(6). In their response, Plaintiffs withdrew all of their claims except their Sherman Act claim.[3]

_____

[3] It is not entirely clear whether Plaintiffs have withdrawn their claim that the challenged statutes constitute special legislation under Section 59 of the Kentucky Constitution. In listing the claims being withdrawn, Plaintiffs only explicitly mentioned their federal constitutional claims, but they also cited the Fourth Count of their Amended Complaint, which was composed solely of the state constitutional claim, and Plaintiffs did not devote any space to defending that claim in their response to this motion. In any case, the challenged statutes are not prohibited special legislation since they are based on "a reasonable and natural distinction which relates to the purpose of the act," namely, the distinction between NPMs and Participating Manufacturers, and the legislation "appl[ies] equally to all in a

8

Therefore, the Court need only address that claim.

## STANDARD OF REVIEW

A district court considering a motion to dismiss must "assume that all allegations are true and dismiss the claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Golden v. City of Columbus*, 404 F.3d 950, 959 (6th Cir. 2005) (internal quotation marks omitted). A Rule 12(b)(6) motion tests the sufficiency of the pleadings and is "not a challenge to the plaintiff's factual allegations." *Id.* at 958-59. However, "[t]o survive a motion to dismiss under Rule 12(b)(6), a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory. . . . [C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005) (internal citations omitted).

## DISCUSSION

### A. Plaintiffs' Antitrust Claim

Plaintiffs seek a declaratory judgment that Kentucky's implementing statutes are preempted by Section 1 of the Sherman Act, 15 U.S.C. § 1, and an order enjoining the enforcement of the

---

class." *St. Luke Hosp., Inc. v. Health Policy Bd.*, 913 S.W.2d 1, 3 (Ky. App. 1996).

same.   In support, Plaintiffs claim that the statutes enacted pursuant to the MSA create an output cartel that is *per se* illegal under the Sherman Act, and for the purposes of this motion the illegal output cartel is presumed to exist.   However, the interpretation of the implementing statutes is the type of "legal conclusion" on which the Court is not bound by Plaintiffs' assertions. *See id.*

**B.   Preemption Under *Rice***

Two findings are required before state legislation can be preempted by the Sherman Act.  First, the Court must determine, as it would with all preemption claims, whether there is an irreconcilable conflict between state and federal law. *See, e.g.*, *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982); *McNeilus Truck and Mfg., Inc. v. Ohio ex rel Montgomery*, 226 F.3d 429, 440 (6th Cir. 2000).  Second, if such a conflict is found, the Court must determine whether the legislation is protected under the doctrine of state action immunity, which will only be the case if the state "clearly articulates" its intention to displace competition and "actively supervises" the anticompetitive behavior. *See Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 222 (2004), *reh'g denied* 363 F.3d 149 (2d Cir. 2004); *see also Rice*, 458 U.S. at 661 n.9 (finding it unnecessary to engage in the immunity analysis after holding that the state statute at issue was not preempted).  Thus, the preemption analysis is logically prior to

10

the state action immunity analysis.

Preemption of state statutes is not to be found lightly. "The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state." *Parker v. Brown*, 317 U.S. 341, 351 (1943). A mere showing that the statute has anticompetitive effects will not lead to a finding of preemption. *See Rice*, 458 U.S. at 659. "[I]f an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the States' power to engage in economic regulation would be effectively destroyed." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 133 (1978).

The standard for antitrust preemption is high:

> [A] state statute, when considered in the abstract, may be condemned under the antitrust laws only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute.

*Rice*, 458 U.S. at 661; *see also 324 Liquor Corp. v. Duffy*, 479 U.S. 335, 345 n.8 (1987) ("Our decisions reflect the principle that the federal antitrust laws preempt state laws authorizing or compelling private parties to engage in anticompetitive behavior."); *McNeilus*, 226 F.3d at 440-41 (applying *Rice*).

The Sixth Circuit recently had the opportunity to apply this standard to an Ohio statute in *McNeilus Truck and Manufacturing,*

11

*Inc. v. Ohio ex rel Montgomery*, 226 F.3d 429, a case closely analogous to the instant case. In *McNeilus*, a seller of remanufactured trucks sought to enjoin an Ohio licensing statute that prevented sellers of new or manufactured vehicles from selling in Ohio unless they either operated their own repair department, or had binding contracts with a sufficient number of repair shops so that the sellers' customers would be able to have their vehicles serviced by someone authorized by the vehicle manufacturer to work on the vehicle without voiding the warranty. *Id.* at 434-35. The Plaintiff in *McNeilus* argued that the licensing statute facilitated a group boycott of independent sellers such as himself, and therefore that it should be preempted under Section 1 of the Sherman Act. *Id.* at 440-441. The district court granted summary judgment to the defendant on the Sherman Act preemption claim, and the Sixth Circuit affirmed that decision. *Id.*

Like the output cartel alleged in this case, the conduct alleged in *McNeilus*, a group boycott, was illegal *per se*. *See id.* at 441; *see also Fashion Originators' Guild, Inc. v. FTC*, 312 U.S. 457, 467-68 (1941) (holding that group boycotts are illegal *per se*). Moreover, the Sixth Circuit accepted that the Ohio statute actually had created the anticompetitive effects complained of, finding that the statute "no doubt facilitates either coordinated action, if such there be, or else uncoordinated (though perhaps unconscious) parallel action by dealers in refusing to enter

12

binding contracts." *See McNeilus*, 226 F.3d at 441. Despite finding that the statute facilitated a *per se* violation of the Sherman Act, the Sixth Circuit refused to enjoin the statute on antitrust grounds. "[T]he statute does not explicitly authorize a boycott." *Id.* Since "the statute neither authorize[d] nor require[d] the dealers to engage in behavior proscribed by the federal antitrust laws," the Sixth Circuit found that there was no preemption, and suggested that it would have been more proper for the plaintiff to sue the dealers actually engaged in the boycott. *Id.*

Likewise, the challenged Kentucky statutes in this case neither mandate that anyone violate the federal antitrust laws in order to comply with the statutes, nor authorize anyone to do so.[4] Also like the statute at issue in *McNeilus*, the Kentucky statutes can be presumed to facilitate conduct that is illegal *per se,* but this is not enough to support a finding of preemption. The

---

[4] Plaintiffs do not address the third prong of the *Rice* standard, "irresistible pressure," in either their Amended Complaint or their Response to the Motion to Dismiss. Reading Plaintiffs' allegations in the most favorable light, this Court cannot find that the Plaintiffs have alleged the existence of irresistible pressures. Plaintiffs' allegations demonstrate that the output cartel allows the participating manufacturers to extract supracompetitive profits. This Court is unaware of any precedent suggesting that legislation facilitating anticompetitive conduct creates irresistible pressure to engage in such conduct, nor indeed is this Court aware of any case from the Supreme Court, the Sixth Circuit, or any other federal court actually finding preemption under the "irresistible pressure" standard in the absence of an explicit statutory mandate.

statutes merely require cigarette manufacturers to pay certain amounts either to the state, for Participating Manufacturers, or into an interest-bearing escrow account, for NPMs; this is not equivalent to an explicit statutory mandate or authorization of a "contract, combination . . . or conspiracy, in restraint of trade" that would be prohibited by the Sherman Act. 15 U.S.C. § 1 (2004).

Other courts that have addressed substantially identical challenges to state tobacco legislation have found that the state statutes were not preempted by the Sherman Act. The District Court for the Northern District of California rejected one similar preemption claim:

> The key allegation of plaintiff's Sherman Act claim is that the MSA creates an incentive for the manufacturer defendants to raise prices in parallel fashion, since a price increase by one OPM alone would increase market share for the others as well as for the SPMs, resulting in their having to make higher payments under the settlement. This scenario presents a "hypothetical" or "potential" conflict with the Sherman Act, but not the "irreconcilable" conflict required for preemption.

*Sanders v. Lockyer*, 365 F. Supp. 2d 1093, 1101 (N.D. Cal. 2005) (dismissing a challenge to California's statutes relating to NPMs); *see also Xcaliber v. Edmondson*, No. 04-CV-0922-CVE-PJC (N.D. Ok. May 20, 2005) (granting summary judgment in favor of the Attorney General of Oklahoma and holding that the Oklahoma version of the ASR Repealer "cannot be said to enforce any market-sharing or price-fixing agreement among manufacturers, or any other private

14

decision to restrain competition").[5]

Plaintiffs support their arguments by pointing to a series of decisions arising out of the litigation challenging a substantially identical set of statutes in New York.[6] *See Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205 (2d Cir.), *reh'g denied* 363 F.3d 149 (2d Cir. 2004), *remanded to* 2004 WL 2035334 (S.D.N.Y. Sept. 14, 2004). The Second Circuit found that the plaintiffs in that case alleged sufficient facts suggesting that the statutes would be preempted to survive a motion to dismiss, *see id.* at 222-26, and on remand the district court granted a preliminary injunction against the enforcement of New York's version of the ASR Repealer, although it denied the injunction against the other implementing statutes. *See*

---

[5] The Court notes that although *Xcaliber* is unreported, both parties devoted substantial space to it in their briefs.

[6] Plaintiffs also cite two decisions by the Third Circuit in passing, but do not rely heavily on them in their argument, which is probably just as well. In the first case, the Third Circuit affirmed the dismissal under the *Noerr-Pennington* doctrine (which was not raised in this case) of a suit brought by NPMs against Participating Manufacturers, and then went on to opine that if the case had not been dismissed under *Noerr-Pennington*, it would also not have been dismissed under the doctrine of state action immunity. *A.D. Bedell Wholesale Co. v. Philip Morris, Inc.*, 263 F.3d 239 (3d Cir. 2001). In a subsequent case brought against the State of Pennsylvania seeking to enjoin the enforcement of its implementing statutes, the Third Circuit also dismissed the suit under *Noerr-Pennington*, and then added a discussion that cast considerable doubt on the logic of *Bedell*, suggesting that the court in *Bedell* had "unintentionally" found the absence of state action immunity for the state, although the court declined to actually overrule the prior opinion. *Mariana v. Fisher*, 338 F.3d 189, 203 (3d Cir. 2003).

*id.*, 2004 WL 2035334 at *1. As support for the decision, the Second Circuit relied on the plaintiffs' allegations that the OPMs "have discretion to increase prices . . . assured that competitors will follow," that "the MSA empowers the tobacco companies to make anticompetitive decisions," and that the combination of the MSA and the implementing statutes "allows OPMs to set up supracompetitive prices." *Id.* at 225-26 (internal citations omitted).

This Court cannot find that the fact that the statutes at issue "empower," "allow," and give "discretion" to the OPMs is sufficient for preemption under *Rice*, which requires that the challenged statutes either mandate or authorize conduct that is in all cases illegal. Even read in the light most favorable to Plaintiffs, these allegations do not constitute the equivalent of a statutory mandate, and while the Second Circuit's reasoning might support a finding of authorization in the abstract, the Sixth Circuit's decision in *McNeilus* forecloses that possibility in this case. In *McNeilus*, there was no dispute that the challenged statute allowed (or empowered, or, if one prefers, gave discretion to) the dealers to engage in conduct that is *per se* illegal by boycotting independent sellers of remanufactured cars, but this was held insufficient to invalidate the statute. A statute will not be preempted if it "does not *explicitly* authorize" the illegal conduct. *McNeilus*, 226 F.3d at 441 (emphasis added).

The Second Circuit felt that it could "not dismiss a challenge

16

to the [statutory] scheme on the grounds that it is not, as a matter of law, anticompetitive. . . . [T]he complaint alleges such an effect and plaintiffs are entitled to attempt to prove it." *Freedom Holdings*, 363 F.3d at 154 (denying rehearing). Nor would this Court hold, as a matter of law, that the statutory scheme is not anticompetitive. However, an anticompetitive effect is not all that Plaintiffs must allege. *See Rice*, 458 U.S. at 659. To survive a motion to dismiss for failure to state a claim, Plaintiffs must allege facts supporting "all the material elements to sustain a recovery." *Mezibov*, 411 F.3d at 716. Plaintiffs must therefore allege the existence of an irreconcilable conflict between the implementing statutes and the Sherman Act, and to do so, those statutes must mandate or authorize conduct that would in all cases violate the Sherman Act. *See Rice*, 458 U.S. at 659. The implementing statutes clearly do not.

## C.   Plaintiffs' Hybrid Restraint Claim

Plaintiffs also argue that the statutes should be preempted as hybrid restraints, which are to be found when state acts grant "private regulatory power" to private parties. *324 Liquor Corp.*, 479 U.S. at 345 n.8. The "private regulatory power" alleged by Plaintiffs is the power of the Participating Manufacturers to force their competitors to follow their price increases so as to avoid an increase in settlement or escrow payments. When a hybrid restraint is found to conflict with federal antitrust law, the statute will

17

only be immune from challenge if it meets the same two-part *Midcal* test as any other statute that is *prima facie* preempted. *See id.* at 343-44 (applying the test developed in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980)). "First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy; second, the policy must be actively supervised by the State itself." *Midcal,* 445 U.S. at 105 (internal quotation marks omitted). The Second Circuit in *Freedom Holdings* found that the MSA and its implementing statutes constituted a hybrid restraint, and also that they could not meet the *Midcal* standard since there was no active supervision of the private parties' price-setting. *See Freedom Holdings*, 357 F.3d at 226-32. This Court need not address the *Midcal* test, however, since the Court finds that the implementing statutes are not preempted under the *Rice* standard.

The concept of hybrid restraints is narrower than Plaintiffs would suggest. Plaintiffs seem to regard a finding of a hybrid restraint as a substitute for the preliminary preemption analysis required by *Rice* and *McNeilus*. It is not. Instead, it is simply a name for a type of regulatory scheme in which the state itself does not directly effectuate the anticompetitive restraint, but instead delegates some authority to others. A finding of a hybrid restraint answers a defendant's claim that there is no "contract, combination . . . or conspiracy in restraint of trade" of the type

18

that would be prohibited by the Sherman Act, nothing more. *See 324 Liquor Corp.*, 479 U.S. at 345 n.8.

In every case in which the Supreme Court has found a hybrid restraint preempted, the statute being challenged *explicitly mandated or authorized* illegal conduct, just as a non-hybrid restraint must in order to be preempted. Therefore, it is natural that there was no need in those cases to dwell on the initial preemption analysis required under *Rice*. In *324 Liquor Corp.* and *Midcal*, the challenged statutes *explicitly mandated* resale price maintenance, which is illegal *per se*. *Id.* at 337-40; *Midcal*, 445 U.S. at 99-100. In *Schwegmann Brothers*, the challenged Louisiana statute *mandated* vertical price-fixing, which is illegal *per se*. *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 386-87 (1951). In *FTC v. Ticor Title Insurance Company*, 504 U.S. 621 (1992), the challenged statutes *explicitly authorized* horizontal price-fixing by title insurance companies, which is illegal *per se*. *See id.* at 630.[7] The absence of a discussion of the *Rice* standard in these cases does not mean that the standard is not applicable to hybrid restraint cases; it simply means that it was not at issue.

---

[7] *324 Liquor Corp.* is the only Supreme Court case to strike down a law using the term "hybrid restraint," and none of the other cases cited above actually use the term, but Plaintiffs and others have characterized the statutory schemes in those cases as "hybrid restraints," and the usage is consistent with the definition in *324 Liquor Corp. See, e.g. Rice*, 458 U.S. at 665-66 (Stevens, J., concurring). The Sixth Circuit has never adopted the concept of a "hybrid restraint" for use in its analysis.

Characterizing the implementing statutes as a hybrid restraint does nothing to lessen the burden on Plaintiffs to allege facts that, if true, would be sufficient to show an irreconcilable conflict between the Sherman Act and the state statutes. The Second Circuit in *Freedom Holdings* held that the statute was preempted because it allowed and empowered private parties to form a cartel, and therefore moved on to the *Midcal* analysis. *See Freedom Holdings*, 357 F.3d at 223-26. However, as discussed in Part B, *supra*, this Court cannot find that the Kentucky statutes at issue either mandate or explicitly authorize conduct that would be in all cases illegal, which is the standard for any challenged restraint in the Sixth Circuit, hybrid or not. Therefore, there is no need to reach whether the statutes are hybrid restraints, or if the statutes would satisfy the *Midcal* test for state action immunity.

### CONCLUSION

Accordingly, and for the foregoing reasons, **IT IS ORDERED:**

(1)    That Defendant's motion to dismiss Plaintiffs' Amended Complaint [Record No. 36] be, and the same hereby is, **GRANTED;**

(2)    That all of Plaintiffs' claims be, and the same hereby are, **DISMISSED WITH PREJUDICE.**

This the 8th day of September, 2005.



**Signed By:**
*Joseph M. Hood* Ꮥᛘᚺᛉ
**United States District Judge**